## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| **JOUREY NEWELL,** individually and on behalf of all others similarly situated, | Case No. 3:25-cv-2043 |
| *Plaintiff,* | **CLASS ACTION** |
| *v.* | **JURY TRIAL DEMANDED** |
| **FOLEY CARRIER SERVICES, LLC.** | |
| *Defendant.* | |

**Plaintiff's Response in Opposition To Defendant's Motion To Dismiss**

## I.    INTRODUCTION

Foley Carrier Services, LLC ("Foley" or "Defendant") is a serial telemarketer.[1] For nearly two years, from February 2024 through at least December 2025, it inundated Plaintiff Jourey Newell's personal, residential cell phone with at least fifteen unsolicited text message calls promoting its paid compliance and regulatory filing services, despite Mr. Newell's explicit requests to stop. It began doing so even though Mr. Newell's number had been registered on the National Do Not Call Registry since 2016, despite Mr. Newell not being a trucker, and despite Mr. Newell never inviting Foley to contact him. When Mr. Newell emailed Foley in October 2025 and demanded that the calls stop, Foley ignored him and kept calling.

This lawsuit is the predictable consequence of that conduct.

---

[1] Foley also includes inflammatory, unproven, and irrelevant assertions about Mr. Newell's prior litigation history. But it admits it is not moving on this ground, simply that is "reserves all rights to seek appropriate relief." Notwithstanding the dubious nature of Defendant's characterizations, these are factual issues the Court need not, and cannot, address at this stage. *See Pro Source*, 2025 WL 817485, at *4-*6, *infra*.

Foley now moves to dismiss, advancing six theories. It argues that the Telephone Consumer Protection Act's ("TCPA") Do Not Call ("DNC") provisions do not protect cell phones, that Mr. Newell's personal cell phone is really a business line (an argument it makes by conflating the Plaintiff's cell phone number with his business number with the same area code), that text messages are not "calls," that its advertising messages were merely informational, that no private right of action exists for its Caller ID violations, and that Mr. Newell lacks Article III standing. None of these arguments has merit.

First, the overwhelming weight of authority, including post-*Loper Bright* decisions, holds that the DNC provision protects residential cell phone subscribers. Second, Foley's own evidence defeats its "business line" theory, because the very number Foley relies upon for claiming that Mr. Newell uses a telephone number for business purposes is *not the personal cell phone number Foley called*. Third, text messages are "calls" under the TCPA, both as a matter of the statute's original public meaning, which encompassed text-based telephone communications well before 1991, and under appropriate statutory analysis and agency respect post-*Loper Bright*. Fourth, text messages urging recipients to engage Foley's paid compliance services are plainly telephone solicitations, not educational information calls. Fifth, the private right of action for Caller ID violations is well-established, with every federal court to have considered the question after the landmark ruling in *Dobronski v. Selectquote Ins. Servs.*, 773 F. Supp. 3d 373 (E.D. Mich. 2025), and *Newell v. JR Cap., LLC*, 791 F. Supp. 3d 571 (E.D. Pa. 2025), the case bearing Plaintiff's own name, has held that a private right of action exists. Sixth, Mr. Newell's declaration and Complaint catalogues the concrete, particularized harms that the Caller ID violation caused him, satisfying Article III.

## II.   FACTUAL BACKGROUND

Plaintiff Jourey Newell is an individual. His personal cell phone number, (484) XXX-XXXX (the "Subject Number"), has been registered on the National Do Not Call Registry since 2016, nearly ten years before Foley's first call. The Subject Number is assigned to a residential cellular telephone exchange service for consumers and is not assigned to any telephone exchange service for businesses. Mr. Newell uses it for personal, residential, and household purposes, such as speaking with friends and family and managing his daily personal affairs. He has never listed the Subject Number in the Yellow Pages or any other public business directory.

Mr. Newell also operates Newell Contracting LLC, a contracting company. It has its own, separate, publicly listed business telephone number: 484-250-1170. Foley's Exhibit A shows that the "company telephone number at the principal place of business" registered with the DOT for Newell Contracting LLC is 484-250-1170, not the Subject Number. Mr. Newell uses 484-250-1170 to communicate with clients, contractors, and to coordinate business matters. Foley sent none of its text messages to 484-250-1170. It sent them all to 484-XXX-XXXX, Mr. Newell's personal cell phone.

Foley is a Connecticut-based limited liability company that sells compliance and regulatory support services for truckers. Its services, which include DOT filings, safety audit assistance, and the like, are provided for a fee. Beginning no later than February 2024 and continuing through at least December 2025, Foley transmitted at least fifteen commercial text message calls to the Subject Number. Each promoted its paid services. Plaintiff's complaint included screenshots of representative examples of these calls. Foley transmitted these calls from four separate caller IDs, which transmitted either CPN or ANI, as 855-640-6799, 860-815-0965, 386-229-4034, and 860-419-0197. None of the messages was transmitted with caller ID information that named either Foley or any telemarketer it hired. Instead, the CNAM (Caller ID

NAMe) results returned generic labels of "TOLL FREE CALL," "GLASTONBURY CT," "LAKE CITY FL," and "CORNWALL CT." And three of the four calling numbers are also "dead" lines which fail an additional test in the TCPA's caller ID requirement because they cannot be called back during regular business hours to lodge a do not call request.

None of the text message calls were solicited, and Mr. Newell never provided any prior express consent to Foley or anyone acting on its behalf to receive them. The failure to transmit accurate CNAM information meant that Mr. Newell could not identify the caller from his lock screen at a glance, was forced to open each message, had no immediate point of contact to demand that the calls stop, and was forced to manually add one of Foley's numbers to his contacts under the label "Foley DOT 🤬 🤬," simply to track who was harassing him.

On October 13, 2025, Mr. Newell sent Foley a direct email containing his full, unredacted cell phone number, 484-XXX-XXXX, and demanding that the calls stop. Foley neither responded to the email nor ceased its campaign. After that date, and with full, actual knowledge that the Subject Number was Mr. Newell's personal cell phone, that he had not consented to receive calls, and that he affirmatively wished them to stop, Foley sent additional text message calls, including the November 14, 2025 and November 21, 2025 calls reproduced in the Complaint.

Mr. Newell filed this class action on December 9, 2025, on behalf of himself and two putative Classes. Mr. Newell's first class alleges violations of the Do Not Call Registry, and Mr. Newell's second class alleges violations of the TCPA's caller ID regulations. Foley now moves to dismiss both Counts pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). This response, filed exactly one hundred and fifty years after the day of the first telephone call, follows. For the reasons set forth herein, its motion should be denied.

### III.     LEGAL STANDARD

Under Rule 12(b)(6), a court may dismiss a complaint that fails to state a claim upon which relief can be granted. In order to state a claim, a complaint must contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). Rather than require detailed pleadings, the Rules demand only a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give defendant fair notice of what the claim is and the grounds upon which it rests. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up).

A motion under Rule 12(b)(1) tests whether the Court has subject matter jurisdiction over the action. The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing that jurisdiction exists, and must do so by a preponderance of the evidence. *Blockbuster, Inc. v. Galeno*, 472 F.3d 53, 57 (2d Cir. 2006). There exist two types of Rule 12(b)(1) challenges: facial challenges and factual challenges. *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016). A facial challenge is one "based solely on the allegations of the complaint or the complaint and exhibits attached to it." *Id.* A plaintiff opposing such a motion bears "no evidentiary burden." *Id.* In a factual challenge, as here, the movant proffers evidence beyond the complaint and its exhibits. *Id.* at 57. In opposition to such a motion, a plaintiff must come forward with evidence of their own to controvert that presented by the defendant, or may instead rely on the allegations in their pleading if the evidence proffered by the defendant is immaterial. *Katz v. Donna Karan Co., L.L.C.*, 872 F.3d 114, 119 (2d Cir. 2017). When the merits of the case and the jurisdictional question are "so entangled that it becomes impossible to separate them," the proper course is to "find that jurisdiction exists and deal with the objection as

5

a direct attack on the merits of the plaintiff's case" because the question of subject matter jurisdiction "is not suited for resolution in the context of a motion to dismiss." *Inteliclear, LLC v. Victor*, No. 3:16CV1403 (JBA), 2016 WL 5746349, at *5 (D. Conn. Oct. 3, 2016).

### IV.    ARGUMENT

**A.    *The Do Not Call Registry applies to and protects Plaintiff's "residential" cell phone line.***

Defendant, citing *Callier*, *Shelton* and *Turizo*, posits that the TCPA's Do Not Call provisions do not apply to cell phones because they only protect "residential subscribers" and thus do not apply to residential cell phones. (MTD at 11-15) (quoting 47 U.S.C. § 227(c)(1)). That's wrong both as a matter of statutory construction as well as the very courts it cites, which each distinguish their reasoning. Start with statutory construction, which analysis remains the same, even after *Loper Bright* and *McLaughlin*. The TCPA's Do Not Call List provisions grant the FCC broad authority "to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." 47 U.S.C. § 227(c)(1). Unless otherwise defined, statutory text is given its "ordinary meaning" in the relevant context "at the time Congress enacted the statute." *New Prime Inc. v. Oliveira*, 586 U.S. 105, 113 (2019). As both the FCC and courts have long recognized, the ordinary meaning of the Do Not Call List provision authorizes the FCC to protect cell phone subscribers. *See, e.g.*, *Chennette v. Porch.com*, 50 F.4th 1217, 1223–1225 (9th Cir. 2022); 47 C.F.R. § 64.1200(e); 18 FCC Rcd. 14014, 14037 ¶¶ 33–36; *Cacho v. McCarthy & Kelly, LLP*, 739 F. Supp. 3d 195, 203 n.4 (S.D.N.Y. 2024) (citing cases).

Start with what the statute prohibits: unwanted "telephone solicitations." 47 U.S.C. § 227(c)(3). "Telephone solicitation" is a defined term in the TCPA. *Id.* § 227(a)(4). In essence, it means "a telephone call or message" "which is transmitted to any person" for commercial purposes, subject to certain exceptions. *Id.* Solicitations to cell phones fit that definition. First, to

state the obvious, a cell phone is a "telephone." *See, e.g.*, 47 U.S.C. §§ 227(b)(1)(A)(iii) (using

the phrase "cellular telephone"). Congress's use of the word "transmitted" also conveys no

preference: "Transmit" means "to send a signal *by radio waves or by wire*." Transmit, Webster's

College Dictionary (1991) (emphasis added). And Congress's use of the word "message" also

suggests that Congress had no particular technology in mind: "Message" means "[a]ny notice,

word, or communication, *no matter the mode and no matter how sent*, from one person to

another." Black's Law Dictionary, 6th Ed. (1991) (emphasis added). Finally, "any person" has a

"naturally broad and inclusive meaning." *Pfizer, Inc. v. Gov't of India*, 434 U.S. 308, 312 (1978).

To see why the FCC's interpretation that a residential cell phone subscriber is eligible for

inclusion on the National Do Not Call Registry comports with the statutory text, next, consider

who the TCPA protects: "residential telephone subscribers" or, elsewhere, just "residential

subscribers." 47 U.S.C. §§ 227(c)(1), (c)(3). Unpacking that language yields the same

conclusion. For starters, under the ordinary meaning of the TCPA at the time of its enactment, a

"subscriber" is anyone who gets a bill in exchange for service. *See Cacho v. McCarthy & Kelly*

*LLP*, 739 F. Supp. 3d 195, 206 (S.D.N.Y. 2024); Subscribe, Webster's College Dictionary

(1991) ("to obtain a subscription to a . . . service, etc."). So a person can be a "telephone

subscriber" to *any* telephone service, either wired or wireless. *Id.*; *Wilson v. Hard Eight Nutrition*

*LLC*, No 6:25-cv-144, 2025 WL 1784815, at *5 (D. Or. June 27, 2025).

Congress knew how to draft technology-specific restrictions. It did so elsewhere in the

TCPA by regulating particular types of telephone "lines" and services. *See, e.g.*, 47 U.S.C. §

227(b)(1)(A)(iii) (calls to "cellular telephone service"); *id.* § 227(b)(1)(B) (calls to a "residential

telephone line"). That's why *Turizo* is distinguishable. It's no surprise that *some* parts of the

TCPA, namely the robocall restrictions in Section 227(b), revolve around particular

technologies, such as cellular telephone services, and lines located in certain facilities, like hospitals and nursing homes. But § 227(c) is not written in terms of "lines." It protects "residential telephone subscribers," a subscriber-focused phrase that turns on whether the subscriber uses the service for residential (i.e., personal) purposes, not on whether the service happens to be wired or wireless. Foley's contrary reading would rewrite § 227(c) to say "residential telephone lines," but Congress chose "residential telephone subscribers" instead. Courts must give effect to that choice.

For similar reasons, Congress's decision to expressly reference "cellular telephone service" in § 227(b), but not in § 227(c), fails to support Defendant's negative-implication argument, in which it cites *Turizo* and *Avon*. Section 227(b) and Section 227(c) have a "markedly different scope and structure." *VanderSloot v. Charles Baratta LLC*, No. 24-cv-7096, 2025 WL 1898929, at *4 (E.D.N.Y. July 9, 2025). Section 227(c) is enabling text: it directs the FCC to "initiate a rulemaking proceeding" and to establish a national do-not-call database through regulations. 47 U.S.C. § 227(c)(1), (3). When Congress enacted § 227(c)(5), the National Do Not Call Registry did not yet exist, and Congress deliberately left the operational details, including which numbers would be eligible for the registry, to the FCC's implementing rules. By contrast, in recognizing the unique harms that certain types of calls posed to certain technologies and locations, Congress explicitly regulated the use of automated calls to the protected lines in Section 227(c). But, in the general context of protecting residential subscribers' "privacy rights," 47 U.S.C. § 227(c)(1), Congress had no reason to specify particular telephone technologies in § 227(c), because the section was written to operate through future rulemaking rather than by enumerating device categories in the statute itself. In 2003, Congress directed the

FCC to establish the national registry and to apply it to *any* "telephone number," including wireless numbers. Pub. L. No. 108–10, § 3; 16 C.F.R. § 310.4(b).

Consistent with that directive, the FCC has permitted wireless subscribers to register since the Registry's inception. In the 2003 order that established the Do Not Call List regulations, the FCC determined that "wireless subscribers" were eligible for protection. *In re Rules and Regulations Implementing the TCPA*, 18 FCC Rcd. 14014, 14037 ¶ 33 (2003). Recognizing that "residential" refers to a phone's use, not its physical characteristics or location, the FCC rejected an argument similar to Defendant's and found that "wireless subscribers often use their wireless phones in the same manner in which they use their residential wireline phones." *Id.* at 14038 ¶ 34–35; *Chennette*, 50 F.4th at 1227–28 (Bress, J., concurring). That position is longstanding and consistent with other FCC decisions before and since. *See, e.g.*, 47 C.F.R. § 20.15; 59 Fed. Reg. 18,493, 18,494–95 (1994); 20 F.C.C. Rcd. 3788, 3793 (2005); 38 F.C.C. Rcd. 12247, 12256–57 (2023).

That leaves the word "residential," which Foley's argument hinges on. But that word doesn't exclude cell phone subscribers, either. As used in the TCPA, "residential" is just the opposite of "business." *See, e.g.*, *Isaacs v. USHealth Advisors, LLC*, 2025 WL 2268359 (N.D. Ga. Aug. 7, 2025). So the word "residential" refers to the *purposes* for which a phone is used, not its physical characteristics or location. *Wilson,* 2025 WL 1784815, at *5; *Jackson v. Direct Bldg. Supplies LLC*, No. 4:23-cv-1569, 2024 WL 184449, at *5–7 (M.D. Pa. Jan. 17, 2024). As the *Jackson* Court explained:

> The best reading of the word 'residential' is not that it modifies the 'telephone,' but rather that 'residential' and 'telephone' both modify the 'subscriber.' So instead of describing a 'subscriber' who owns a 'residential telephone,' Section 227(c)(1) describes a 'telephone subscriber' who has subscribed for 'residential,' i.e., personal, purposes. 'Residential' is therefore used in the broader sense of 'relating to a resident' to distinguish such a subscriber from a business or commercial telephone subscriber, who cannot be added to

the Do Not Call registry.

And "residential subscriber" means a subscriber who uses their phone "for personal activities associated with his or her private, domestic life." *Cacho*, 739 F. Supp. 3d at 206; *Lirones v. Leaf Home Water Sols., LLC*, No. 5:23-CV-2087, 2024 WL 4198134, at *6 (N.D. Ohio Sept. 16, 2024); *accord Wilson*, 2025 WL 1784815, at *5. Many cell phone subscribers, including Mr. Newell, fit that description. As alleged, Mr. Newell uses his number for "personal, residential, and household reasons," Compl. ¶ 18, exactly the kind of everyday home use the statute protects.

The TCPA's text and FCC regulations further establish that meaning of the word "residential" and confirm it refers to use. That's how Congress used the word "residential" in the TCPA's statutory findings, which noted that "businesses actively telemarket goods and services to *business and residential* customers." Pub. L. No. 102–243, 105 Stat. 2394, § 2 (emphasis added).[2] The current text of the TCPA, as amended in 2005, also contrasts "residential subscriber" with "business subscriber." 47 U.S.C. § 227(a)(2)(A).[3] And FCC regulations dating back to the 1990s explicitly define "residential subscriber" to mean "a subscriber … *that is not a business subscriber*." 47 C.F.R. § 64.2305(d) (emphasis added); *see* 14 F.C.C. Rcd. 15550, 15692 (1999). There is no question that cell phones can be "residential," as nothing in the text indicates that Congress intended to couch recovery on the presence or absence of a physical wire.

That meaning of "residential" also aligns with the "express aim" of the Do Not Call List: to protect residential subscribers' ""privacy rights.'" *Wilson*, 2025 WL 1784815, at *6 (quoting

---

[2] Other findings similarly contrast "home" to contrast with "business": Congress found that telemarketing to "the home and other businesses" was widespread, and that automated and recorded calls "to businesses as well as to the home" needed to be curtailed. Pub. L. No. 102–243, 105 Stat. 2394, § 2.

[3] *See* Junk Fax Prevention Act of 2005, Pub. L. No. 109–21, 119 Stat. 359, § 2.

47 U.S.C. § 227(c)(1), (2)). That shows that "Congress's interest in Section 227(c) was in the person and province that was being invaded and not simply in the technology through which the invasion was effected." *Cacho*, 739 F. Supp. 3d at 207. Those interests "do not depend upon whether the undesired telephone solicitations are received on a cellular phone rather than a landline." *Lyman v. QuinStreet, Inc.*, No. 23-cv-5056, 2024 WL 3406992, at *4 (N.D. Cal. July 12, 2024). That is especially true today, when many households use a cellular number as their only home phone, and Congress did not tether privacy protections to a disappearing technology.

As early as 1993, Congress declared that cell phone companies would presumptively be treated as "common carriers" for most purposes. *See* Omnibus Budget Reconciliation Act of 1993, Pub. L. 103-66, 107 Stat. 312 (enacting 47 U.S.C. § 332(c)(1)(A)). Ever since, the phrase "common carrier" has meant both landline and cell phone companies, *unless* the FCC specifically determines otherwise for purposes of a particular statute. *See* 47 U.S.C. § 332(c)(1)(A); Daniel T. Deacon, *Administrative Forbearance*, 125 Yale L.J. 1548, 1568, 1574–75 (2016). Exercising that authority, the FCC has determined that uses of the term "common carrier" in the TCPA do refer to cell phone companies. *See* 47 C.F.R. § 20.15(a); *Implementation of Sections 3(n) and 332 of the Communications Act Regarding Regulatory Treatment of Mobile Services*, 59 Fed. Reg. 18,493, 18494–95 (1994). That matters because § 227(c) uses the phrase "common carrier" twice to identify the telephone companies whose "subscribers" would be protected by the Do Not Call List. *See* 47 U.S.C. § 227(c)(3)(B), (C).[4]

Defendant's other authorities are thoroughly unpersuasive. As the Western District of

---

[4] For example, § 227(c)(3)(B) says that if the FCC decides to implement a national Do Not Call List, its regulations must "require each *common carrier* providing telephone exchange service … to inform subscribers for telephone exchange service of the opportunity to provide notification … that such subscriber objects to receiving telephone solicitations" (emphasis added).

Texas, the very Court that decided *Callier*, explained in distinguishing it, "There is no binding precedent that would foreclose Plaintiff's allegations, as pleaded, under the TCPA. . . . This Court agrees with courts in the Fifth Circuit that have held that a cellular telephone number qualifies as a residential number under the TCPA if the plaintiff alleges sufficient facts to make it clear that his cellular telephone is used for residential purposes." *Callier v. Optimum Solar USA*, No. EP-23-CV-00273-KC-MAT, 2024 WL 2044832, at *6 (W.D. Tex. Mar. 21, 2024); *accord Callier v. Unified Health, LLC*, No. EP-23-CV-375-KC, 2024 WL 3418778, at *6 (W.D. Tex. July 15, 2024) (crediting nearly identical allegations of "personal, family, and household use."). Similarly, in *Shelton*, the Court expressed its own divination on the issue in a footnote and expressly noted that the argument had not been raised and thus refused to consider it in *granting judgment to the Plaintiff* on his Do Not Call Registry claims for calls made to his cell phone. *Shelton v. Fast Advance Funding, LLC*, 378 F. Supp. 3d 356, 363 n.7 (E.D. Pa. 2019), *aff'd*, 805 F. App'x 156 (3d Cir. 2020). Defendant cannot credibly claim that the *dicta* of a Court that granted a judgment for very right of action it called into question seriously calls into question the claims at issue here, particularly insofar as the issue was never even briefed.

In *Cunningham*, a *pro se* plaintiff failed to plead that his cellphone served as a residential line. *See Myrick v. Adapthealth, LLC,* No. 6:22-CV-00484-JDK, 2023 WL 5162396, at *3 (E.D. Tex. June 26, 2023) ("Plaintiffs allegations regarding his cellular phone qualifying him as a residential telephone subscriber distinguish this case from the line of *Cunningham* cases cited by Defendants."). Defendant also cites *Gaker v. Q3M Ins. Sols.* but omits critical context: *Gaker* was an unresolved magistrate recommendation. And *Gaker* likewise has been subsequently distinguished by other North Carolina federal courts, including in *Hudson v. Palm Beach Tan,*

*Inc.*, No. 1:23CV486(WO)(JEP), 2024 WL 4190513, at *3-4 (M.D.N.C. Aug. 12, 2024), where the Court distinguished *Gaker* on at least three bases.

Recognizing as much, courts have continued to defer to the FCC's well-reasoned decision to allow registration of cell phone numbers, even after *Loper Bright* and *McLaughlin*, holding it comports with the plain statutory language. *See, e.g.*, *Harriel v. Bealls, Inc.*, No. 8:25-cv-1165, 2025 WL 2379617, at *2 (M.D. Fla. Aug. 15, 2025); *Wilson*, 2025 WL 1784815, at *5; *Lirones*, 2024 WL 4198134, at *7; *Lyman*, 2024 WL 3406992, at *4; *Isaacs*, 2025 WL 2268359 at *2. This court should do the same. Ultimately, as one Court put it addressing a similar motion: "even if the FCC's ruling is not entitled to deference, an independent analysis reveals that the agency got it right." *Abboud v. Lotta Dough, LLC*, No. 1:24-CV-00482-JRN, 2025 U.S. Dist. LEXIS 35547, *3 (W.D. Tex. Feb. 27, 2025). This Court can, and should, follow suit.

**B.    *The Plaintiff pleads he uses his personal cell phone for "personal, residential, and household reasons." Defendant appears to misapprehend the number it called.***

Second, Defendant claims that, even if the TCPA did apply to residential telephone numbers, the Plaintiff has failed to plead that his telephone number is used for residential purposes. This is untrue. The Plaintiff pleads that he "uses the number for personal, residential, and household reasons," Compl. ¶ 19, and that the number "is a residential telephone line because it is assigned to a residential telephone exchange service for consumers and is not assigned to a telephone exchange service for businesses." Compl. ¶ 20. At the pleadings stage, this is sufficient, under either Rule 12(b)(1) or 12(b)(6). *Shelton v. Pro Source Lending Grp. LLC*, No. CV 24-4394, 2025 WL 817485, at *4 (E.D. Pa. Mar. 14, 2025).

Defendant's *own evidence* reflects that the Plaintiff's company, Newell Contracting LLC, which is *not* a trucking company, Newell Dec. ¶ 8, has a telephone number of 484-250-1170. As Mr. Newell's declaration makes clear, that is *not* the number to which Defendant sent the text

message calls to; on the contrary, it called 484-XXX-XXXX, which is the Plaintiff's personal cell phone number. (Newell Dec. ¶ 11.) Foley knew this fact because the Plaintiff "sent them an email containing [his] full, unredacted telephone number 484-XXX-XXXX asking for the calls to stop, but they did not." (Newell Dec. ¶ 12.) This evidence, as well as the fact that Newell Contracting LLC has a separate business telephone number, 484-250-1170, actually *supports* the Plaintiff's allegations that he uses his cell phone number for residential purposes. Mr. Newell has his personal cell phone and a separate phone line for his business. Plenty of business owners do the same and maintain a cell phone for personal use distinct from their business number. That doesn't mean their personal numbers are ineligible, nor do Defendant's authorities suggest that.

In practically all the cases to which the Defendant cites, the respective courts held either (1) that the complaints did not contain sufficient factual material to establish that the telephone numbers were used for residential purposes, as in *Gillam* and *Hicks*, or (2) demonstrated business use of the number at summary judgment, as in *Lee* and *Bank*. In *Bank v. Indep. Energy Grp. LLC*, the Court at the pleadings stage *denied* the motion to dismiss, holding:

> Defendants claim that the number involved in this case has been held out to the public by Bank to be the business number of his law firm. They argue that Bank lists the phone number on his professional letterhead, on the signature block in court documents, and on other publicly available resources on the Internet. If Defendants are correct about the ways in which Bank has advertised this number, it would not qualify as residential under the TCPA. But the complaint does not allege the number at issue and this is a motion to dismiss.

No. 12-CV-1369, 2014 WL 4954618, at *4 (E.D.N.Y. Oct. 2, 2014). Later, after the defendant provided evidence as to the business use of the number, the Court cited to multiple facts, not present here, for its conclusion that, at the time of the alleged calls, the plaintiff held out the telephone number to the public as a business line. *Bank v. Indep. Energy Grp. LLC*, No. 12-CV-1369 JG VMS, 2015 WL 4488070, at *2 (E.D.N.Y. July 23, 2015).

In any event, the Plaintiff's complaint pleads *facts* which were not present in, for example *Gillam*, and which other courts have held to be sufficient at this stage. Among these pled facts, the Plaintiff states that he uses the number for "personal, residential, and household *reasons*," and, marshaling the text of 47 C.F.R. § 64.2305(d), pleads that his telephone line is "assigned to a residential telephone exchange service for consumers and is not assigned to a telephone exchange service for businesses." This is sufficient. *E.g.*, *Callier v. Unified Health, LLC*, No. EP-23-CV-375-KC, 2024 WL 3418778, at *6 (W.D. Tex. July 15, 2024). Indeed, in this respect, *Owens* actually *supports the Plaintiff*, despite being cited by the Defendant. There, this very Court *denied* the motion to dismiss, crediting the Plaintiff's allegations that the "telephone number in question" was a "'home' or 'residential' telephone number." *Owens v. Starion Energy, Inc.*, No. 3:16-CV-01912 (VAB), 2017 WL 2838075, at *4 (D. Conn. June 30, 2017). This Court should follow its holding in *Owens* and refuse to dismiss at this stage, particularly when the Defendant attempts dismissal based on the business use of a telephone number it did not even call as an initial matter. That number is completely irrelevant here.

**C.    *A text message "call" is a "call" under the TCPA.***

In a variation of its first argument, Defendant claims that this case should be dismissed because the provisions of the Do Not Call list allegedly do not apply to text message calls. Defendant is again incorrect. As an initial matter, the regulation that makes the Do Not Call regulations applicable to text messages, 47 C.F.R. § 64.1200(e), makes clear that it applies both to text messages and cell phones, "The rules set forth in paragraph (c) and (d) of this section are applicable to any person or entity making telephone solicitations or *telemarketing calls or text messages* to wireless telephone numbers." And the three cases Defendant cites are contravened

by many more[5] cases disagreeing with their reasoning and holding that a text message is a "call" under the TCPA, including through applying this regulation. *Wilson v. Hard Eight Nutrition LLC*, 804 F. Supp. 3d 1141, 1151 (D. Or. 2025); *Mujahid v. Newity, LLC*, No. 25 C 8012, 2025 WL 3140725, at *2 (N.D. Ill. Nov. 10, 2025); *Wilson v. MEDVIDI Inc.*, No. 5:25-CV-03996-BLF, 2025 WL 2856295, at *2 (N.D. Cal. Oct. 7, 2025); *Wilson v. Skopos Fin., LLC*, No. 6:25-CV-00376-MC, 2025 WL 2029274, at *4 (D. Or. July 21, 2025); *Hudson v. Palm Beach Tan, Inc.*, No. 1:23CV486(WO)(JEP), 2024 WL 4190513, at *6 (M.D.N.C. Aug. 12, 2024); *Bosley v. A Bradley Hosp. LLC*, No. 25-CV-22336, 2025 WL 2686984, at *5 (S.D. Fla. Sept. 19, 2025); *Evers v. CampaignSidekick, LLC*, No. 24 CV 11067, 2025 WL 2896818, at *4 (N.D. Ill. Oct. 10, 2025). In particular, this Court should follow the most directly applicable Second Circuit authority on the issue, the Southern District's decision in *Wilson v. Better Mortg. Corp.*, -- F. Supp. 3d --, 2025 WL 3493815, *5 (S.D.N.Y. Dec. 5, 2025).

Defendant cites three out of circuit authorities, *Jones v. Blackstone Med. Servs., LLC*, *Davis v. CVS Pharmacy, Inc.*, and *Sayed v. Naturopathica Holistic Health, Inc.*, for the proposition that a text message is not a "call." In each, the courts considered the fact that text messages did not exist in 1991, when the TCPA was enacted, and further insisted that nobody describes text messages as telephone "calls" in ordinary conversation. *Jones*, 792 F. Supp. 3d 894, 899 (C.D. Ill. 2025). Of course, text messaging didn't exist yet when the TCPA was passed in 1991. But that is no matter: The plain meaning of the word "call" in the TCPA has long been understood to encompass any attempt to communicate by phone, "regardless of whether that call is communicated by voice or text." *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 954 (9th

---

[5] Even this list is not comprehensive. Every month additional decisions continue to add to the "growing consensus" that text message calls are calls under the TCPA. *Better Mortg. Corp.*, 2025 WL 3493815 at *5, *9.

Cir. 2009); *see* 18 FCC Rcd. 14014, 14115 ¶ 165 (2003).

Most importantly, Defendant's argument is precluded by long-running binding authority in the Second Circuit. *Wilson* is particularly significant in this respect because it does not merely cite the Second Circuit in passing. It uses the Second Circuit's reasoning as a central answer to a defense argument that mirrored the argument Defendant advances here: that because text messaging technology either did not exist at the time of enactment or is not what a "normal person" would label a "call," the do-not-call provisions should be read not to reach texts. *Wilson* explains why that framing is the wrong way to read the statute, and it reinforces that conclusion by invoking the Second Circuit's recognition that the nuisance and privacy invasion associated with spam texts are the same harms that motivated Congress when enacting the TCPA:

> [T]he Second Circuit has recognized, as to § 227(b), that 'the nuisance and privacy invasion attendant on spam texts are the very harms with which Congress was concerned when enacting the TCPA'—notwithstanding that that mode of telephone communication did not yet exist."

*Wilson*, 2025 WL 3493815, at *5 (quoting *Melito v. Experian Mktg. Sols., Inc.*, 923 F.3d 85, 88 (2d Cir. 2019)). *Wilson* then went on to explain *Melito*'s importance for the argument here:

> In *Melito*, *supra*, the Circuit addressed whether plaintiffs' receipt of unsolicited text messages, absent any other injury, was sufficient to demonstrate injury-in-fact to confer Article III standing. Plaintiffs had filed a putative class action under § 227(b), alleging injury based on the unwanted texts. The Circuit held injury-in-fact adequately pled. It reasoned, in part: "[T]ext messages, while different in some respects from the receipt of calls or faxes specifically mentioned in the TCPA, present the same 'nuisance and privacy invasion' envisioned by Congress when it enacted the TCPA." . . . .

> Given the weight of authority that § 227(b) covers text messages despite its narrower scope as to modes of technology than § 227(c), it logically follows that § 227(c) also covers text messages. Limiting § 227(c)'s reach to telephone voice calls while § 227(b) covers voice as well as text messages would create an irrational asymmetry at odds with the statute's text and structure. It would also be at odds with the Second Circuit's recognition that "the nuisance and privacy invasion attendant on spam texts are the very harms with which Congress was concerned when enacting the TCPA.

*Id.* at *7-8. The practical importance of *Wilson* is also heightened by its procedural posture. It is a direct ruling on a nearly identical motion. It therefore addresses the same standards that govern here in circumstances materially similar to those alleged in this case, including unsolicited marketing text message calls sent to a number on the National Do Not Call Registry. And it reaches the result sought by the Plaintiff here while expressly relying on the Second Circuit's understanding of the harms Congress sought to prevent. This makes *Wilson* valuable not just for its conclusion but for its reasoning and its alignment with controlling circuit law.

*Melito* is not an outlier. The Second Circuit has time and again treated text messages as "calls" for TCPA purposes. *Duran v. La Boom Disco, Inc.,* 955 F.3d 279, 283–84 (2d Cir. 2020) (quoting the Supreme Court, "[i]t is undisputed that a text message…qualifies as a 'call'" and holding an unwanted text is a concrete injury). Those decisions align this Circuit with the Supreme Court's framing and the prevailing national consensus that texts fall within the TCPA's ambit. To be clear, the fact that the Second Circuit in *Melito* and *Duran* relied in part on the FCC's interpretation does not diminish the continuing force of those decisions post-*Loper* and *McLaughlin*. Those cases each conducted their independent textual analyses, and the FCC's interpretation was simply cited as additional support. Post-*Loper*, that structure remains entirely sound. Courts must first independently interpret the statute, then confirm whether the agency has acted according to the text where Congress has expressly delegated implementation authority. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024) (explaining this framework).

It is no surprise then, that, in this Circuit, district courts following *Melito* and *Duran* have treated text message calls as "calls" within the meaning of the TCPA. *Jackson v. Caribbean Cruise Line, Inc.*, 88 F. Supp. 3d 129, 135 (E.D. NY. 2015); *Krady v. Eleven Salon Spa*, No. 16CV5999MKBRML, 2017 WL 6541443, at *3 (E.D.N.Y. July 28, 2017) ("[I]n this Circuit,

district courts have treated text messages as "calls" within the meaning of the TCPA."); *Rotberg v. Jos. A. Bank Clothiers, Inc.*, 345 F. Supp. 3d 466, 474 (S.D.N.Y. 2018); *Metten v. Town Sports Int'l, LLC*, No. 18-CV-4226 (ALC), 2019 WL 1299939, at *2 (S.D.N.Y. Mar. 21, 2019); *Bank v. Simple Health Plans LLC*, No. 18CV6457MKBST, 2019 WL 7878570, at *5 (E.D.N.Y. Dec. 12, 2019) ("[T]he text message that Plaintiff received qualifies as a call for which TCPA liability may lie.").

The conclusion reached by the Second Circuit in *Melito*, as explained by *Wilson*, is not surprising; it articulates a well-established tenet of statutory construction. Although "every statute's *meaning* is fixed at the time of enactment," there is nothing odd about old text finding "new *applications*" as times change. *Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 284 (2018). To see why the TCPA comfortably encompasses a text message as a "call" in the same manner as the first telephone call sent exactly 150 years ago, consider a 1991 law that bars "vehicles" from a park. That law applies equally to Cybertrucks and to sedans, even though the former didn't exist at the time. So, too, here: The TCPA prohibits sending text message calls to phone numbers on the national Do Not Call List, just as it prohibits traditional voice calls. To interpret a statutory term, courts look to its "ordinary meaning" "at the time Congress enacted the statute," referencing dictionaries of the era. *Perrin v. United States*, 444 U.S. 37, 42 (1979). Here, the "ordinary, contemporary, common meaning" of the word "call" in this context is "'to communicate with or try to get into communication with a person by a telephone.'" *Satterfield*, 569 F.3d at 953–54 & n.3 (quoting *Webster's Third New International Dictionary* (2002)). There's no question that a text is a "telephone" communication; of course it is. It's sent to a "telephone number," just like other transmissions that can violate the Do Not Call List rules. *See* 47 U.S.C. § 227(c)(3)(F). It plainly fits within the definition of a "call," just as a voice call does.

*Jones* and its progeny[6] get statutory interpretation wrong in two important ways. *First*, they are wrong as a textual-techno-historical matter. The courts' analysis in these cases systematically exclude the experiences and needs of deaf and hard-of-hearing individuals, who have used text-based communication for telephone calls since long before the TCPA was enacted in 1991. The *Davis* court's assertion that "no normal person refers to a text message, or thinks of a text message, as a 'call,'" is flawed in that it excludes those who have used text-based communication to make "telephone calls" long before 1991. *Davis*, 797 F. Supp. 3d 1270, 1273 (N.D. Fla. 2025). This reasoning is not neutral. It is profoundly ableist. For millions of Americans who rely on TTY/TDD (teletypewriter/telecommunications device for the deaf) technology or have other hearing disabilities, text messages are not just "telephone calls," they are often the *only* way these individuals can make and receive "telephone calls."

The *Davis* court's assertion that "no normal person refers to a text message, or thinks of a text message, as a 'call'" is particularly revealing and disturbing. What is a "normal person" in this analysis? Apparently, it is someone who can hear and who uses voice communication. Deaf and hard-of-hearing individuals, who very much do think of text messages as telephone calls, are implicitly excluded from the Court's definition of "normal." This is precisely the kind of assumption that disability rights law has sought to combat for decades. Under the reasoning of *Jones*, *Davis*, and *Sayed*, deaf individuals would have had no private right of action under § 227(c)(5), even in 1991, because they did not receive "telephone calls," they received text message calls. The fact that text messages are the only way these individuals can receive

---

[6] The same faulty reasoning is embraced nearly identically in all three cases. Defendant may attempt to marshal one additional Eleventh Circuit case recently decided, *Radvansky v. Bubolo Med., LLC*, No. 1:24-CV-04365-SCJ, 2025 WL 3306417, at *1 (N.D. Ga. Aug. 15, 2025), but that case simply relies on the same faulty reasoning as *Jones*, *Davis*, and *Sayed*. Besides, these authorities run directly contrary to binding Second Circuit law in *Melito* and *Duran*, *supra*.

telephone calls is deemed irrelevant. They are left without protection from the very harms that Congress sought to prevent when it enacted the TCPA. By defining "telephone call" based solely on the experience of hearing persons, i.e. involving voice communication, these decisions effectively write deaf and hard-of-hearing individuals out of the TCPA's protections entirely.

The interpretive approach adopted in *Davis*, *Jones*, and *Sayed* is also fundamentally at odds with how courts have interpreted statutes affecting people with disabilities. Disability rights law recognizes that equal treatment requires considering the different ways in which people with disabilities interact with the world. *Davis* and its progeny fail to do so, assuming that deaf people are not "normal," a discriminatory position that represents a failure to consider the lived experiences of millions of disabled individuals. Disability rights advocates have long challenged the notion that "normal" should be equated with "non-disabled." Lisa Eichhorn, *Major Litigation Activities Regarding Major Life Activities: The Failure of the Disability Definition in the Americans with Disabilities Act of 1990*, 77 U.N.C. L. Rev. 1405, 1410 ("[T]he notion that there is something wrong or abnormal about people with disabilities is equally arbitrary."). When courts define statutory terms based solely on the experiences of hearing people, they perpetuate the marginalization of deaf and hard-of-hearing individuals.

It is therefore incorrect to assert that the original public meaning of "telephone calls" extended only to voice-based communications when the statute was enacted in 1991. It did not. The premise of *Davis* and its progeny, that text messaging via telephones did not exist in 1991, is demonstrably false when one considers the universe of text-based telephone communications that existed in 1991, and, indeed, had existed for decades before. TTY/TDD devices allow deaf and hard-of-hearing individuals to communicate over telephone lines by typing text messages that are transmitted in real-time to another TTY/TDD device or to a relay operator. This

technology has been available since the 1960s, and grew out of the same technology, teletype machines, that transmitted written words using telephone lines that flashed such important news as V-E Day and the Kennedy assassination. And that same line of devices has grown into fax machines, pagers, telex machines, and, yes, text messages, all using the same pair of conductors into which Alexander Graham Bell shouted "Mr. Watson, come here, I want to see you," precisely a century and a half ago, on March 10, 1876. Leonard C. Bruno, *'Mr. Watson, Come Here'*, LIBRARY OF CONGRESS (April 1999), https://www.loc.gov/loc/lcib/9904/bell.html.

By 1991, TTY/TDD devices were widely used by the deaf community, and their use was explicitly recognized in federal telecommunications law. The Americans with Disabilities Act, enacted in 1990, just one year before the TCPA, *required* telephone companies to provide text-based telephone services to deaf and hard of hearing individuals on equal footing to "voice transmission services." 47 U.S.C. § 225. Congress was acutely aware in 1991 that "telephone calls" could be, and for millions of deaf Americans, routinely were, conducted through text-based communication. Indeed, it so recognized when it used the term "voice transmission services" to refer to the particular subset of telephone calls sent using a voice, as opposed to text-based "telecommunications relay services." And, Congress explicitly referred to such text-based services as "calls," for example, in prohibiting relay operators from "keeping records of the content of any such conversation beyond the duration of the *call*." 47 U.S.C. § 225(d)(5). Even today, text messaging is a blessing for deaf and hard-of-hearing individuals, who use such communication to more effectively communicate without needing to secure the services of a relay operator to make such "calls" each time they desire to use the telephone.

"The contemporary definition of "telephone call" was therefore not limited to oral or vocal communications. It encompassed any communication made using a telephone." *Wilson v.*

*Better Mortg. Corp.*, 2025 WL 3493815, *5 (S.D.N.Y. Dec. 5, 2025). When Congress enacted the TCPA in 1991, it was legislating against the backdrop of the recently enacted ADA and the longstanding use of text-based telephone call technology used by the deaf community and millions of individuals and businesses who had teletypewriters, pagers, and telex machines alike. Congress knew that "telephone calls" could take multiple forms, including voice calls or text messages. To interpret "call" in a way that excludes text-based communication is to ignore this historical context and, even worse, to effectively discriminate against people with disabilities. If a text "call" to a TTY device or pager can violate the TCPA, a text "call" to a cell phone can too, because it shows "that the term 'call' cannot invoke only the common usage … in which a 'call' refers to oral communication between two parties via telephone." *Lozano v. Twentieth Century Fox Film Corp.*, 702 F. Supp. 2d 999, 1004–05 (N.D. Ill. 2010).

 *Jones*, *Davis*, and *Sayed* all stated that interpreting "telephone calls" to include text messages would amount to updating the statute to reflect technological changes. But it is just as clear that each of these courts abdicated their interpretative responsibility, not just in terms of a demonstrably wrong textual analysis, but also in ignoring the statutory framework and purposes of the TCPA. The TCPA's purpose was and is to protect consumers from unwanted telephone solicitations that invade their privacy and disrupt their daily lives. Unwanted text messages, particularly to individuals who are deaf and hard-of-hearing, are every bit as intrusive as unwanted voice calls, and perhaps more so, given the additional challenges implicit in living a life with hearing loss. To exclude text messages from the TCPA's protections based on a hyper-literal and historically ignorant reading of "telephone call" would thus defeat the TCPA's purpose. More troubling still, the courts' reasoning effectively punishes Congress for having been forward-thinking about disability access. At bottom, Congress chose to use the term

"telephone call" rather than "voice call" or "spoken communication," in the TCPA, just as in the ADA, where it recognized text "calls." This choice should be understood as inclusive of all forms of communication sent and received by telephones, including text-based telephone "calls."

Second, *Davis* and its progeny got the statutory interpretation wrong by applying the wrong standard. Courts look to statutes' ordinary "meaning at the time of … adoption" to interpret them, not "modern intuition." *New Prime, Inc. v. Oliveira*, 586 U.S. 105, 114 (2019). As Judge Engelmayer of the Southern District explained, "the meaning of 'telephone call' in 1991—when the TCPA was enacted—was broad enough to encompass text messages." *Better Mortg. Corp.*, 2025 WL 3493815, at *5. As he elucidated:

> The ordinary public meaning of "telephone call" when the TCPA was enacted in 1991 was a communication made by telephone. *See, e.g.*, Webster's Ninth New Collegiate Dictionary 197 (1989) ("the act of calling on the telephone," *i.e.*, "to get or try to get into communication by telephone," or "to deliver (a message) by telephone"); Webster's Third New International Dictionary 318 (1993) ("to communicate with or try to get into communication with a person by telephone"); *see also Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 953–54 (9th Cir. 2009) (same). The contemporary definition of "telephone call" was therefore not limited to oral or vocal communications. It encompassed any communication made using a telephone.

> Text messages fit easily within that broad definition. It is undisputed that text messages are communications sent by telephone. They therefore fall within the ordinary public meaning of "telephone call" as that term was used when the TCPA was enacted.

The problem with applying modern parlance to a statute written in 1991, as *Jones*, *Davis*, and *Sayed* did, is that modern parlance can be misleading as times change. *See id.* at 114-16. As the Court explained in *Alvarez v. Fiesta Nissan, Inc.*, No. 7:25-CV-00343, 2026 WL 202930, at *4-5 (S.D. Tex. Jan. 26, 2026):

> There is nothing in the meaning of "telephone" that excludes the function of a text message. Remarkably relevant here is the classic case of *In re Erickson*, 815 F.2d 1090 (7th Cir. 1987). In that case, Judge Easterbrook considered a Wisconsin statute that made certain farming property unavailable to satisfy a civil judgment, allowing a farmer to retain "one mower" and "one hay loader." *Id.* at 1091-92. Just one problem: since the law's passage in 1935, farm technology had changed considerably. Old horse-drawn "mowers" were replaced by hydraulic,

tractor-mounted haybines with hay conditioners, and "hay loaders" were replaced by automatic bailing/tying machines. *Id.* at 1092-93. And yet, the court found that the new technology was embraced by the old terms. Specifically, Judge Easterbrook wrote that a "'mower' is not limited to the thing called a mower today," because "[a] statutory word of description does not designate a particular item (e.g., "a Massey-Ferguson Mower, Model GY—2589, manufactured in 1935, serial number 3875808") but a *class of things* that share some important feature." *Id.* at 1092 (emphasis added). Indeed, "a mower with a built-in stereo cassette deck would still be a 'mower', . . . because it would still cut the hay," yet with "a second function, entertainment, just as the haybine has a second function, crushing the hay." *Id.* at 1093.

The Court finds this reasoning persuasive here. Defendant seems to define "telephone call" as "a call from a telephone as existed in 1991"—that is, *only* able to communicate by voice. But if "telephone" was as absolutely defined by its sound-transmission ability as required by that reading, it would prevent an otherwise unlawful voice call using a telephone with *any* modern features from falling under the statute. Thus, voice calls from almost every modern telephone—most of which can text, among many other capabilities—would not qualify as a "telephone call" under § 227(c)(5). "[T]he fact that a statute can be applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth." *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998) (quotation omitted). Just as a mower that both cuts and conditions hay is still a mower, a telephone which communicates texts and voice is still a telephone. And just as an aircraft built a hundred years from now such that it "could not have been dreamed today" can be embraced by 2012 statute regulating aircraft, so can a call from a telephone built in 2025—or 2125 for that matter—be embraced by a 1991 statute. Scalia & Garner, *supra*, at 16. Later meaning ascribed to words like "text message" cannot affect the Courts analysis of the original meaning of the phrase; in fact, considering the broad original meaning of "call" in 1991, society reasonably might have decided to refer to all telephone communications as "calls." That society does not today has no bearing here.

None of Defendant's arguments on agency deference hold any weight, either. As an initial matter, the FCC exercised its Congressionally-authorized authority to provide explicit statutory protection in the TCPA's implementing regulations, and not mere interpretative guidance, to subscribers who use their wireless telephone numbers to receive text messages. *See* 47 C.F.R. § 64.1200(e) (confirming that all Do Not Call List regulations are applicable to "telephone solicitations or telemarketing calls or text messages to wireless telephone numbers"). As an appropriately promulgated administrative regulation authorized by Congress, that statutory

pronouncement has the force and effect of law, even after *Loper Bright*. *Chrysler Corp. v. Brown*, 441 U.S. 281, 282 (1979). The Supreme Court has also weighed in on the issue. *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 156 (2016) ("A text message to a cellular telephone, it is undisputed, qualifies as a 'call'".). And, the Ninth Circuit Court of Appeals explicitly reaffirmed its holding in *Satterfield* that text messages are "calls," after, and with full knowledge of, *Jones* and its progeny. *Howard v. Republican Nat'l Comm.*, No. 23-3826, --- F.4th ---, 2026 WL 90273 (9th Cir. Jan. 13, 2026). Finally, as Plaintiff has explained, there is no reason why the term "call" could not have included text-based communication, as telephone calls that utilized text unquestionably existed in 1991.

In this context, it's easy to see why the FCC interpreting the term "call" in the TCPA furthers the guiding purpose of the Do Not Call List, "to protect residential telephone subscribers' privacy rights to avoid receiving *telephone solicitations* to which they object." *Id.* § 227(c)(1), and thus why the FCC did not exceed the limits of its Congressionally-authorized mandate in doing so. The key operative term is "telephone solicitations," which are defined in the TCPA as "the initiation of a telephone call *or message* for the purpose of encouraging the purchase or rental of, or investment in, property, goods or services, which is transmitted to any person." *Id.* § 227(a)(4). That definition is "more concerned with the purpose of the telephone communications than the form in which those communications are transmitted." *Wilson v. Medvidi*, 2025 WL 2856295, at *3 (N.D. Cal. 2025). "Defendant's invitation to inject a distinction between written and oral telephone solicitations is contrary both to the remedial bent of the TCPA and precedent." *Id.* It also contravenes the long-established precedent on the remedial purposes of the TCPA. *Esquivel v. Mona Lee, Inc.*, No. 3:25-CV-00607, 2025 WL 3275607, at *3 (S.D. Cal. Nov. 24, 2025). This is not to mention that Defendant's strained

approached leaves telephone subscribers "at the mercy of advancing technology" and permits it to "erode the privacy guaranteed by the" TCPA merely because technology has advanced. *Kyllo v. United States*, 533 U.S. 27, 28 (2001) (extending Fourth Amendment protections to new technology).

Sometimes, "the best reading of a statute is that it delegates discretionary authority to an agency." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024). Even after *Loper Bright* and *McLaughlin*, agencies can still receive deference for their reasonable interpretations in appropriate cases, and neither case affects explicit agency rulemaking, so long as Congress articulated an intelligible principle and the agency promulgates law consistent with Congress' articulated intent. *Id*. at 394-95. In that case, a court's role is merely to "fix[] the boundaries" of agency authority and ensure "reasoned decisionmaking" within them. *Id.* That's precisely what Congress did when it directed the FCC to "initiate a rulemaking proceeding concerning the need to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." 47 U.S.C. § 227(c)(1), and which the FCC dutifully did.

Acting under that express delegation, the FCC reasonably explained that prohibiting texts to numbers on the Do Not Call List "make[s] … enforcement easier," "eliminate[s] any potential confusion in the industry," and aligns with both its longstanding determination that cell phone numbers are eligible for protection and the established meaning of the word "call" in other TCPA contexts. 38 F.C.C. Rcd. at 12256–57 ¶¶ 26–27. Even after *Loper Bright* and *McLaughlin*, Congress can still permit an agency to create a definition when a statute "expressly delegate[s] to an agency the authority to give meaning to a particular statutory term," tasks an agency "to fill up the details of a statutory scheme," or tells an agency "to regulate subject to the limits imposed by a term or phrase that leaves agencies with flexibility, such as 'appropriate' or 'reasonable.'"

27

*Loper Bright*, 603 U.S. at 395. Because the FCC acted reasonably and consistently in reaching

that conclusion, this Court should affirm that "reasoned decisionmaking." *Id.* at 395.

Once Defendant's flawed interpretation of the statute is set straight, the analysis here is

straightforward: Plaintiff received multiple unwanted marketing text message calls, and those

calls indisputably violated the FCC's Do Not Call List rules. 47 C.F.R. § 64.1200(c)(2), (e). Mr.

Newell therefore "received more than one telephone call within any 12-month period … in

violation of the regulations," and may sue to enforce his "privacy rights to avoid receiving

telephone solicitations" that he does not want. 47 U.S.C. § 227(c)(1), (5). For the foregoing

reasons, this Court should hold that Mr. Newell received text message "calls."

**D.     *The calls Plaintiff received were "telephone solicitations" because they encouraged him to use Defendant's trucking paperwork and compliance services.***

Plaintiff's complaint makes the Defendant's business model clear. Plaintiff alleges that

the Defendant "provides support services for the trucking industry," Compl. ¶ 5, including, as

evident from the text messages that the Plaintiff outlines, providing FMCSA filing services,

safety audits, compliance services, annual filing services, and the like. Compl. ¶ 23. Defendant

cannot seriously claim with a straight face that these text message calls were not sent to solicit

recipients to purchase Foley's trucking-oriented paperwork and compliance services.

Defendant cannot credibly try to recast text messages that encourage recipients to call

Foley for any manner of the services enumerated, including getting DOT forms filled out and

getting a safety audit completed, as purely "informational" and "educational" calls. If Defendant

were to be believed, late night infomercials "educating" potential consumers about carpet dirt

and how it can be prevented with a particular model vacuum cleaner fit in the same category as

*Mr. Rogers' Neighborhood.* After all, on Defendant's account, neither program encourages the

viewer to "purchase or invest in" any "property, goods, or services." 47 U.S.C. § 227(a)(4).

That characterization is absurd.

The calls encouraged Plaintiff to call the Defendant and visit its website, on which it promotes its compliance and paperwork services, including providing the aforementioned safety audits, drug and alcohol testing, and assistance navigating DOT compliance. Defendant does not do these services for free or out of the goodness of its heart; it charges for them. Consider one example of the text message calls that Defendant sent that it highlights in its brief: that a DOT number was placed Out of Service. These messages explicitly invite the Plaintiff to reply to "set up a meeting with" Foley and to "work with a compliance pro at Foley" so that the safety audit could be passed, and to "avoid violations and fines." The messages clearly encourage the Plaintiff, therefore, to purchase the Defendant's services.

Though the definition of a "telephone solicitation" requires the "purchase" or "investment" in "property, goods or services," courts across the country have held that messages encouraging a person to engage with an entity, even one offering "free" services, qualify. *Chesbro v. Best Buy Stores, L.P.*, 705 F.3d 913, 918 (9th Cir. 2012) (call encouraging redemption of free reward points at a store was telemarketing); *Cacho*, 739 F. Supp. 3d at 209. ("[T]he challenged calls allegedly sought to encourage *Plaintiff* to contract with Defendant and to direct a portion of a future right to payment to Defendant. While those funds would originate from a third party, the calls urged the relevant decisionmaker- namely, Plaintiff-to allocate those funds."); *Bais Yaakov of Spring Valley v. Alloy, Inc.*, 936 F. Supp. 2d 272, 283 (S.D.N.Y. 2013) ("the fact that the recipient of the fax is not the one paying for the product does not make the proposed transaction non-commercial"); *Rockwell v. Medicus Healthcare Sols., LLC*, No. 24-CV-128-LJV, 2025 WL 959745, at *4 (W.D.N.Y. Mar. 31, 2025) ("[S]ervices that appear to be free or to offer recruitment opportunities may 'serve as a mere pretext for commercial

services.'") (quoting *Suescum v. Fam. First Life, LLC*, No. 6:21-CV-1769-WWB-EJK, 2023 WL 311144, at *2 (M.D. Fla. Jan. 19, 2023) (quoting *Neurocare Inst. of Cent. Fla., P.A. v. Healthtap, Inc.*, 8 F. Supp. 3d 1362, 1367 (M.D. Fla. 2014) (quoting *In re Rules*, 21 F.C.C.R. 3787, 3814 (Apr. 6, 2006)))). As *Suescum* explains, "Plaintiffs allege that Defendant's text messages prompted them to view a website encouraging them to purchase warm leads. As a result, the instant case is distinguishable from the cases cited by Defendant because Plaintiff has sufficiently alleged that Defendant's *unsolicited texts served as a pretext to commercial activity*—the sale of leads to insurance agents." *Suescum*, 2023 WL 311144, at *3.

The two cases Defendant cites as "support" for its contention that the calls were not "telephone solicitations" are particularly unappealing. First, in *Katz*, the complaint contained "no factual allegations as to the nature of any call, i.e. the goods or services being solicited, nor any factual allegations as to any benefits [Defendant] received from Plaintiff as a result of any alleged call." *Katz v. CrossCountry Mortg., LLC*, No. 1:22-CV-00925, 2022 WL 16950481, at *6 (N.D. Ohio Nov. 15, 2022). Here, the calls plainly solicited Foley's trucking compliance and document preparation services. And, in Horton, the message simply stated that "everyone ages 12 and up is eligible for the COVID vaccine." *Horton v. Tarrant Cnty. Hosp. Dist.*, No. 4:22-CV-9-P, 2022 WL 702536, at *1 (N.D. Tex. Feb. 4, 2022). Unlike in *Horton*, each text message contained Foley's contact information for each of the problems that Foley was purportedly "informing" the Plaintiff about.

What Foley did is no different than a landscaper knocking on a homeowner's door to point out that a tree limb is about to fall on their roof. Despite Foley's attempts to categorize such advertisements as "informational," the implication is obvious: Foley stood ready, for a cost, to provide a solution to the problem it identified. To the extent it disputes these factual

assertions, a Rule 12(b)(6) motion is the inappropriate place to do so. The Plaintiff has plausibly alleged the calls were plainly telephone solicitations subject to the TCPA.

**E.    *There is a private right of action for Plaintiff's caller ID claim.***

In contending that there exists no private right of action for the caller ID regulations codified at 47 C.F.R. § 64.1601(e), Defendant fails to address the very precedent that the Plaintiff has set bearing Mr. Newell's name, in which the United States District Court for the Eastern District of Pennsylvania explicitly held that there does exist a private right of action for such claims. *Newell v. JR Cap., LLC*, 791 F. Supp. 3d 571, 575 (E.D. Pa. 2025). *Newell* was not decided in a vacuum; it itself was heavily based upon the Eastern District of Michigan's recent holding in *Dobronski v. Selectquote Ins. Servs.*, 773 F. Supp. 3d 373, 375 (E.D. Mich. 2025).

In *Selectquote*, the Eastern District undertook a comprehensive analysis of the genesis of the private right of action for caller ID claims under 47 C.F.R. § 64.1601(e) *Selectquote*, 773 F. Supp. 3d at 375. *Selectquote* represents the most comprehensive analysis of Section 1601(e) undertaken by a Court to date, and its reasoning was adopted in full by the *Newell* Court. Since *Dobronski*, *every single court* to consider a Section 64.1601(e) caller ID claim has held that there is a private right of action for violations thereof, including in the District of Oregon, where the Court held as wrongly decided a previous opinion holding that there was no private right of action. *Newell*, 791 F. Supp. 3d 571; *Dobronski v. CHW Grp., Inc.*, 2025 WL 2426370, at *7; *Dobronski v. Juliasangel Mktg., LLC*, No. 2:24-CV-12379-TGB-APP, 2025 WL 2659265, at *11 (E.D. Mich. Sept. 17, 2025); *Barton v. Bright Solar Marketing LLC*, No. 3:25-CV-05310-DGE, 2025 WL 2880136, at *5 (W.D. Wash. Oct. 9, 2025); *Dobronski v. Daraujo*, No. CV 25-10169, 2025 WL 3908484, at *8 (E.D. Mich. Dec. 1, 2025), *report and recommendation adopted*, No. 25-10169, 2025 WL 3708891 (E.D. Mich. Dec. 22, 2025); *Barton v. Am. Fam. Life Assurance Co. of Columbus*, No. 3:25-CV-05671-TMC, 2026 WL 25742, at *5 (W.D. Wash. Jan. 5, 2026);

*Weingrad v. DaBella Exteriors, LLC*, No. 3:25-CV-396-SI, 2026 WL 496609, at *6 (D. Or. Feb. 23, 2026).

      *Selectquote* and its progeny have thoroughly addressed and rejected the reasoning adopted by the citations relied on by Defendant, including *Worsham*, and the other *Dobronski* cases. This Court should continue to adopt the same reasoning embraced *every other* Federal Court to have addressed the issue post-*Selectquote.* To see why the Defendant's authorities got it wrong, and to understand the trend of courts holding that it is right to hold that Section 1601(e) has a private right of action, one must consider its genesis. As the *Newell* Court explained:

> In my view, *Worsham* misunderstands the structure of the statute. In § 227(c), Congress explicitly delegated to the FCC the authority to evaluate different methods and procedures to protect privacy rights – including network technologies – and issue appropriate regulations. If § 64.1601(e) is promulgated as a "method or procedure" to "protect residential telephone subscribers' privacy rights," it fits under § 227(c) and a private cause of action exists. And the administrative record establishes that the FCC viewed caller ID as a "network technology" that Congress *required* the FCC to evaluate as a method and procedure to protect consumer privacy under § 227(c). Thus, caller ID fits into § 227(c), even if (c) does not mandate that the FCC adopt technological methods and authorizes non-technological methods and procedures as well. *See also Dobronski*, 773 F.Supp.3d 373 (concluding, on a motion for reconsideration, that § 64.1601(e) was promulgated under § 227(c), and rejecting *Worsham*'s technology-focused arguments).
>
> Further, § 227(d) only applies to telemarketing made using specific technologies – fax machines, automatic telephone dialing systems, and artificial and prerecorded voice messages – whereas § 64.1601(e) applies to a broader range of telemarketing calls, including traditional manually dialed telemarketing calls. The Third Circuit has cautioned that "our starting point [in regulatory interpretation] is to attempt reconciliation of seemingly discordant statutes and regulations." *LaVallee Northside Civic Ass'n v. Virgin Islands Coastal Zone Mgmt. Comm'n*, 866 F.2d 616, 623 (3d Cir. 1989). It is difficult to discern how § 64.1601(e) could have been lawfully promulgated under § 227(d) without exceeding the FCC's delegated authority. Section 64.1601(e) thus fits best under § 227(c), not (d).
>
> *Worsham* does not grapple with these issues, but attempts instead to have § 64.1601(e) straddle two sections of the statute, an outcome for which I can discern no legal authority. The regulation fits comfortably within § 227(c), which supports the existence of a private right of action.

*Newell*, 791 F. Supp. 3d at 579. The issue with all the authorities Defendant cites is that

they did not consider under which section of the TCPA the subject regulation, 47 C.F.R. §

64.1601(e), was promulgated, nor did they reach their conclusion independently. Instead of

tussling with the statute and analyzing it, as in *Selectquote* and its progeny, each of the

authorities Defendant cites simply rested on persuasive authority from other courts which

themselves relied on faulty and underdeveloped reasoning and did not engage in extensive

analysis as to the precise genesis of this right of action, which is 47 U.S.C. § 227(c). As best

Plaintiff can discern, *Dobronski* was the first court to engage in such analysis, which the *Newell*

and subsequent courts credited.

      As a codified federal regulation dealing with "telemarketing," and with explicit

references to the definitions promulgated under the TCPA in 1991 in 47 C.F.R. § 64.1200(f)(13),

this particular regulation must have been promulgated under *some* part of the TCPA. "It is

axiomatic that an administrative agency's power to promulgate legislative regulations is limited

to the authority delegated by Congress." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208

(1988). In this regard, only a handful of subsections of the TCPA allow for the promulgation of

regulations:

> • § 227(b)(2) authorizes the FCC to implement requirements that relate to the use of
> prerecorded voices and automatic telephone dialing systems;
> • § 227(c) authorizes the FCC to promulgate rules relating to the "need to protect
> residential telephone subscribers' privacy rights";
> • § 227(d)(1)–(3) allow regulations relating to technical and procedural standards related
> to fax machines, automatic telephone dialing systems, and "systems that are used to transmit any
> artificial or prerecorded voice message";
> • § 227(e)(3) provides for regulations relating to misleading or inaccurate caller ID; and
> • § 227(i) allows for the FCC to promulgate regulations to streamline information sharing
> with the FCC related to violations

*Dobronski*, 773 F. Supp. 3d at 376. As the Court observed in *Dobronski*, all but § 227(c) are

quickly eliminated as not even remotely applicable to the statutory provision here. The statutory

provision at issue here could not have been promulgated pursuant to Section 227(d), because that

Section relates only to fax machines and automatic telephone dialing systems, not to telemarketing calls in general, just as Section 227(b), which is inapplicable for identical reasons. Section 227(e)(3), though it deals with Caller ID, was enacted *after* § 64.1601(e), so that's out. And, finally, the transmission of accurate caller ID name has nothing to do with information sharing with the FCC relating to violations contained in Section 227(i). *Id.*

Both the decisions in *Newell* and *Dobronski* are supported by the legislative history under which the instant subsection was enacted. The subject regulation here, 47 C.F.R. § 64.1601(e), was promulgated in 2003 under rulemaking Congress explicitly authorized when it passed the Do Not Call Implementation Act of 2003, 15 U.S.C. § 6153 ("2003 Act"), which related to *consumer privacy*, the mainstay of Section 227(c), as discussed in Section A, *supra*.

Pursuant to that mandate, the FCC began a rulemaking proceeding that expressly sought comment on whether "network technologies have been developed over the last decade," and which ultimately resulted in an order promulgating the implementation and incorporation of the instant caller ID legislative rule, as well as Do Not Call Registry rules. *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991* ("2003 TCPA Order"), CG Docket No. 02-278, Report and Order, 18 FCC Rcd. 14014, 14118. As the FCC explained in that 2003 TCPA Order rulemaking proceeding, "The new rules will also require all companies conducting telemarketing to transmit caller identification (caller ID) information, when available, and prohibits them from blocking such information." *Id.* at 14017. "[T]he 2003 FCC [TCPA O]rder applies to section 227(c). . . . Therefore, Radvansky may bring a case." *Radvansky v. Kendo Holdings, Inc.*, 744 F. Supp. 3d 1314, 1321, 1321 n.3, n.4 (N.D. Ga. 2024).

And contrary to Defendant's statement that the FCC was silent when it promulgated Section 1601(e), in the same document it used to create the Do Not Call regulations, the FCC

*explicitly tied* the Caller ID requirements at issue here to the TCPA's private right of action in Section 227(c), reasoning that "Caller ID requirements will improve the ability of consumers *to identify and enforce* do-not-call rights against telemarketers. . . . Consumers are frustrated by the failure of many telemarketers to transmit caller ID information, which, under certain circumstances, *makes it difficult for consumers to enforce* the TCPA." *Id.* at 14068, 14118 (emphasis added). The 2003 TCPA Order references Section 227(c) no fewer than *54 times* and only one other section, Section 227(d), only *once*, in the context of a 1997 regulation requiring fax broadcasters to print their information on fax messages. *Id.* at 14134. It references no other section of the TCPA as authority for the regulations it promulgated. The FCC appropriately concluded that, pursuant to its authority *under Section 227(c) of the TCPA*, "the caller ID requirements at 47 C.F.R. § 64.1601(e) will go into effect on January 29, 2004." *Id.* at 14143. There can be no question that the FCC promulgated the instant regulation under its authority under Section 227(c) of the TCPA, which required the FCC to promulgate privacy regulations.

Executive agencies do not create regulations absent an explicit authorization from Congress. *Bowen*, 488 U.S. at 204. Defendant's implicit assumption that the FCC can create § 64.1601(e) without a statutory home is contrary to *Bowen* and its progeny, including *Alexander v. Sandoval*. ("[W]hen a statute has provided a general authorization for private enforcement of regulations, it may perhaps be correct that the intent displayed in each regulation can determine whether or not it is privately enforceable. But it is most certainly incorrect to say that language in a regulation can conjure up a private cause of action that has not been authorized by Congress. Agencies may play the sorcerer's apprentice but not the sorcerer himself.") 532 U.S. 275, 291 (2001). Given that courts presume that agencies act lawfully and given that the instant regulation must rest on *some* subsection of § 227, once subsections (b), (d), (e), and (i) are eliminated, only

(c) is left standing. And § 227(c) explicitly permits not only the FCC to implement "regulations to implement methods and procedures for protecting the privacy rights described in such paragraph," 47 U.S.C. § 227(c)(2), but also explicitly imparted consumers with a private right of action to enforce the "regulations prescribed under this subsection," 47 U.S.C. § 227(c)(5), precisely as envisaged by the Supreme Court in *Alexander* when it speaks of a "general authorization for private enforcement of regulations" that Congress explicitly authorized. This Court should continue to adopt the precedent set by Mr. Newell himself and every Court to have considered the issue from that point.

**F.    *Plaintiff has standing because the provision of inaccurate caller ID name information harms him.***

Defendant also argues that Plaintiff allegedly lacks standing because he lacks a concrete injury stemming from the Defendant's failure to transmit accurate caller ID information, as well as failure to provide a caller ID number that could be called to lodge a do not call request. However, the failure to provide such information does in fact harm the Plaintiff, as the Plaintiff's declaration makes clear. In his declaration, Mr. Newell points out that the lack of accurate caller ID information, among other things, undermines trust in the source of the text message calls he received, prevented him from lodging a Do Not Call request by calling the number, and that the Plaintiff was forced to add the Defendant's number to his contacts, which cluttered his contacts. (Newell Dec.) And without a name, he had no idea who was truly calling him. These are all hams beyond the statutory harm itself and thus satisfy the *Guthrie* standard. It is plain from the face of the Complaint, the Plaintiff's own declaration, and the harms the requirement seeks to remedy, that the Plaintiff has suffered a cognizable injury in fact.

However, even putting that aside, the subject regulation protects consumer privacy, and the failure to abide by it results in concrete harms sufficient for Article III standing. Far from a

bare procedural violation, the failure to transmit accurate caller ID information imposes real harms on consumers. As the FCC observed, "Caller ID allows consumers to screen out unwanted calls and to identify companies that they wish to ask not to call again. Knowing the identity of the caller is also helpful to consumers who feel frightened or threatened by hang-up and "dead air" calls. We disagree with those commenters who argue that caller ID information only benefits those consumers who subscribe to caller ID services. . . . Caller ID also should increase accountability and provide an important resource for the FCC and FTC in pursuing enforcement actions against TCPA and TSR violators." 2003 TCPA Order, 18 F.C.C. Rcd. at 14121.

Nor is it any matter that the messages mentioned Foley. Anyone can say that they are anyone else in a text message or phone call, but the provision of caller ID name information, which has to be verified by a telephone company, provides an additional level of assurance to confirm the identity of the caller. This further lends credence to the obvious fact that the Caller ID information requirements here were created to buttress the TCPA's own caller-specific identification requirements found at 47 CFR § 64.1200(d)(4) for reasons exactly as this. It also permits persons like Mr. Newell to call someone, reach a human, and lodge a DNC request.

These harms are exactly in line with those that Congress and the FCC recognized when it promulgated the instant rule. Congress explicitly passed the 2003 Act with the explicit statement that the TCPA's then-current consumer privacy protections were inadequate. It is clear that, in Congress' directive to align the FTC and FCC's procedures, Congress intended for any subsequent rulemaking, including the FCC's 2003 TCPA Order, to remedy a concrete harm by giving a right of action. Indeed, Congress explicitly stated that, "despite [internal do not call list and other] restrictions, telemarketing complaints continue to rise and there is an increasing need to provide consumers with the ability to opt-out of telemarketing calls." House Report 108–8,

108th Cong., 1st Sess. (2003) at 2-3. Accordingly, the Committee explicitly explained that:

> The FCC's do-not-call rules were created under the TCPA. That statute explicitly gives the FCC the authority to set up a national do-not-call database. In 1992, the FCC undertook a rulemaking, and after reviewing comments, determined that a national do-not-call list was too costly and burdensome at that time. The FCC instead opted to require telemarketers to maintain company-specific do-not-call lists. On September 12, 2002, the FCC issued a notice of proposed rulemaking to *review and possibly revise* its do-not-call rules. The comment period closed on January 31, 2003, and the FCC's Chief of Consumer and Governmental Affairs Bureau announced that the FCC's goal is to avoid regulatory duplication by working closely with the FTC and fashioning rules that benefit consumers and the telemarketing industry. As the FCC undertakes the process of revising its do-not-call regulations, there is the potential for inconsistencies between the FTC and FCC do-not-call rules. To address this issue, H.R. 395 directs the *FCC to complete its rulemaking within* 180 days of enactment and further requires the FCC to consult and coordinate with the FTC to maximize consistency between the two regulations. However, because the *FCC is bound by the TCPA*, it is impossible for the FCC to adopt rules identical to the FTC's TSR. . . . In order to remedy these types of inconsistencies, either the FTC or FCC must address them administratively, or Congress must address them legislatively. We encourage the FTC and the FCC to take the necessary steps to make their rules as consistent and compatible as possible.

*Id.* at 4 (emphasis added). The 2003 TCPA Order took that congressional mandate to align the FTC and FCC's rules seriously, including with respect to the *very caller ID provision at issue*, by observing that the "FTC also adopted new rules on the use of predictive dialers and the transmission of caller ID information. . . . Telemarketers will also be required to transmit the telephone number, and, when made available by the telemarketer's carrier, the name of the telemarketer, to any caller identification service." 2003 TCPA Order, 18 F.C.C. Rcd. at 14024. Consistent with the Committee's intent, Congress required the FCC to issue the 2003 TCPA Order, a "final rule pursuant to the rulemaking proceeding that it began on September 18, 2002, *under the Telephone Consumer Protection Act* (47 U.S.C. 227 et seq.)." 15 U.S.C. § 6153 (emphasis added). It further directed that, "In issuing such rule, the Federal Communications Commission shall consult and coordinate with the Federal Trade Commission to maximize consistency with the rule promulgated by the Federal Trade Commission." *Id.* As explained above, the FCC explained that part of that alignment included adoption of caller ID rules similar

to those promulgated by the FTC in the Telemarketing Sales Rule, which similarly deals with consumer privacy and is enforceable by the FTC. The instant regulation flows naturally from Congress' mandate to ensure consistency between FTC and FCC regulations.

As in other portions of the TCPA, the benefits that caller ID information provides to consumer privacy protections means that the failure to transmit accurate information prohibits consumers from *inter alia*, identifying callers at a glance, interferes in their daily lives, inhibits them from effectively lodging DNC requests, as well impedes the process of holding telemarketers accountable under the TCPA. Those harms are typical of the other common law harms affecting consumer privacy interests that give rise to a cognizable Article III injury. *Dickson v. Direct Energy, LP*, 69 F.4th 338, 344 (6th Cir. 2023) (reasoning that TCPA claims in class actions is sufficient to establish Article III standing because the intrusion caused by unwanted communications bears a close relationship to the kinds of harms protected by the common law, including intrusion upon seclusion); *Drazen v. Pinto*, 74 F.4th 1336, 1342 (11th Cir. 2023) ("intangible harms can satisfy Article III's concreteness requirement"); *Wakefield v. ViSalus, Inc.*, 51 F.4th 1109, 1118 (9th Cir. 2022).

Given that the provision of caller ID name provides an increased accountability and resource, especially here, it is a separate requirement constituting a separate violation of the TCPA constituting a concrete harm, and for good reason. Caller ID provides a technologically expedient, separate, and arguably more reliable means, of connecting the caller to the text message than the content of the text message itself, which requires human reading and intervention. It facilitates consumer choice on what messages to read and aids blocking. It distinguishes spam from important business messages. It gives consumers a point of contact to call and lodge a do not call request. The TCPA's Caller ID requirement thus counsels against

dismissal on the specious basis that the failure to abide by it does not constitute a cognizable injury. For the foregoing reasons, the text message at issue did not comply with 47 C.F.R. § 64.1601(e)'s requirements, which is itself a harm that the statute remedies.

## V.    CONCLUSION

This Court must deny Defendant's motion to dismiss in its entirety. Alternatively, it should permit the Plaintiff to amend to correct any deficiencies.

Dated: March 10, 2026

*/s/ Andrew Roman Perrong*
Andrew Roman Perrong, Esq.
D. Ct. # CT31815
Perrong Law LLC
2657 Mount Carmel Avenue
Glenside, Pennsylvania 19038
Phone: 215-225-5529 (CALL-LAW)
Facsimile: 888-329-0305
a@perronglaw.com

## CERTIFICATE OF SERVICE

I certify that I filed the foregoing via ECF on the below date, which will automatically send a copy to all attorneys of record on the case.

March 10, 2026

*/s/ Andrew Roman Perrong*
Andrew Roman Perrong, Esq.